In re Roger K. GLAZE, Debtor.

In re Wilma A. FERRIS, Debtor.

Paul J. WINTER, Josephine M. Winter and Mohave Realty, Inc., Movants,

v.

Roger K. GLAZE; Wilma A. Ferris and Rhonda Repp, Trustee, Respondents.

Bankruptcy Nos. 93–02216–PCT–SSC, 93–02217–PCT–RTB.

United States Bankruptcy Court, D. Arizona.

June 28, 1994.

Daniel F. Furlong, Law Office of Daniel F. Furlong, Prescott, AZ.

Ron Petica, Petica & Scholz, Bullhead City, AZ, for debtors.

Rhonda Repp, Trustee, Prescott, AZ.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### Procedural History

This matter is before the Court pursuant to the *"Motions to Assume Contract to Sell Real Estate Property and Pay Real Estate Commission"* and the *"Motions for Relief from Automatic Stay"* filed by PAUL J. WINTER and JOSEPHINE M. WINTER (hereinafter the "Winters") and MOHAVE REALTY, INC. (hereinafter "Mohave Realty"), collectively known as the Movants, the Motions having been filed on May 6, 1993 and May 10, 1993, respectively, in Case No. 93–02216–PCT–SSC and Case No. 93–02217–PCT–RTB. On May 17, 1993, ROGER K. GLAZE and WILMA A. FERRIS, the Debtors herein, filed a Response to the Motions to Assume. On May 24, 1993, the Movants filed their Reply. On July 20, 1993, the parties filed a *"Stipulated Statement of Facts and Exhibits."* On May 10, 1994, the Movants also filed Motions for Relief from the Automatic Stay. The Debtors filed their Objections on May 24, 1993.

On June 2, 1993, the Movants filed a *"Motion to Consolidate Motions to Lift Automatic Stay"* in the bankruptcy proceeding of Roger K. Glaze, Case No. 93–02216–PCT–SSC and bankruptcy proceeding of Wilma M. Ferris, Case No. 93–02217–PCT–RTB. On July 20, 1993, the Movants and the Debtors filed a *"Stipulation to Consolidate"* the Motions for Relief from the Automatic Stay. On July 30, 1993, an Order was entered approving the stipulation on consolidation.

On July 12, 1993, the Court held an initial hearing in Prescott, Arizona on the Motions to Assume. At that time, the hearing was continued to August 9, 1993, for oral argument to be conducted on the Motions to Assume and the Motions for Relief from the Automatic Stay.

At the August 9, 1993 hearing, this Court instructed the Debtors to file and serve a supplemental memorandum of law by September 7, 1993. The Court instructed the Movants to file their responsive memorandum of law by October 18, 1993. This Court then ordered that these matters be continued for a further hearing on October 18, 1993. This Court ordered that Winters deposit the sum of $83,000 in escrow,[1] without prejudice to the Movants' rights concerning the issues before the Court.

On September 3, 1993, an Order was entered confirming the Court's directions regarding the escrow deposit. The Debtors and Movants complied with the Court directions and filed their memoranda of law.

This Court then held additional hearings on October 18, November 8, and December 13, 1993. Because of the issue of first impression in this District of the interplay between Section 553 of the Bankruptcy Code and the right of the Debtors to claim a homestead exemption on the proceeds received from the sale of their real property, this Court took this matter under advisement.

This constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* ("RBP"). This is a "core" proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### Stipulated Facts

The Debtors owned, as co-tenants, a residence located at 3308 Saddleback Drive, Lake Havasu City, Arizona, and legally described as Lot 2, Block 20, Tract 2168, Mohave County, Arizona (the "Property"). On or about May 30, 1992, the Debtors listed the property for sale with Mohave Realty, one of the Movants herein. The listing agreement was signed by both of the Debtors. The listing agreement provided for a six percent (6%) commission to be paid to Mohave Realty. Around June 16, 1992, Wilma A. Ferris signed a change order to the listing agreement. This change order did not have a material effect on the listing agreement.

Around June 17, 1992, the Winters offered to purchase the Property. This offer was

---

1. The Stipulated Facts address the dispute between the parties and the reason for the payment of the sum of $83,000.

conveyed to the Debtors by the agents of Mohave Realty. Around July 20, 1992, the Debtors made a counteroffer which was accepted by the Winters. The consideration to be paid for the purchase of the Property was approximately $83,000. The Debtors did not open escrow to complete the sale.

Winters and Mohave Realty jointly commenced an action against the Debtors in the Superior Court, Mohave County, Arizona, Cause No. 92–CV–735. Winters requested specific performance to force the Debtors to convey the Property to them and for damages suffered due to the fluctuations in the Canadian–American monetary exchange rates.[2] Mohave Realty requested the six percent (6%) commission for the sale of the Property.

A trial was held in the Mohave County Superior Court on February 3, 1993. On February 24, 1993, a formal judgment was entered in favor of Winters and Mohave Realty against the Debtors. The relevant portions of the judgment are set forth below:

the Court makes the following findings of fact and conclusions of law:

1. Defendants [Debtors] and a real estate broker entered into a contract to sell Defendants['] home;

2. The real estate broker, or their agents, found a buyer for the Defendants['] home;

3. After offers/counteroffers, the Defendants agreed to sell their home;

4. Plaintiffs WINTER performed on the contract by paying earnest money;

5. Defendants refused to sign the escrow instruction;

6. Defendants suffered from personal conflicts which affected their decision to sell their home;

7. Defendants personal conflicts did not amount to an impairment to perform on the contract;

8. Plaintiffs have been damaged by Defendants failure to perform; and

9. There was no coercion, nor undue influence, only a change of heart.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:

1. Granting relief as requested by the Plaintiffs and ordering specific performance under the contract between the parties hereto, and directing the Defendants, and each of them, to execute all documents required to close the agreement between the parties on its original terms to transfer all of their right, title and interest in LOT 2, BLOCK 20, TRACT 2168, Lake Havasu City, Mohave County, Arizona, and more commonly known as 3308 Saddleback, Lake Havasu City, Arizona, to PAUL J. WINTER AND JOSEPHINE M. WINTER, and

2. Ordering that the real estate commission due to Mohave Realty, Inc. in the sum of FOUR THOUSAND NINE HUNDRED EIGHTY DOLLARS ($4,980.00) be paid from the proceeds of sale of the property, and

3. Entering Judgment for the Plaintiffs WINTER and against the Defendants, and each of them, in the sum of FOUR THOUSAND NINE HUNDRED DOLLARS ($4,900.00) along with interest on that sum from September 14, 1992 until paid, and

4. Entering Judgment for the Plaintiffs, and each of them, and against the Defendants, and each of them, in the sum of $2,912.75 as the Plaintiffs' court costs and attorney's fees incurred in connection with this proceeding, and

5. Ordering that the Clerk of the Mohave County Superior Court is hereby appointed to negotiate and execute any documents necessary to convey the subject real property to the Plaintiff WINTER as set forth herein, in the case that the Defendants refuse to sign the necessary escrow documents and deed to the property to convey title to the Plaintiffs WINTER.

On March 8, 1993, the Debtors filed separate Chapter 7 bankruptcy proceedings, and a Trustee was appointed.

---

2. At the time of purchase of the Property, the Winters were residents of Canada. The Winters alleged that the failure of the Debtors to convey promptly the Property to them caused the Winters to suffer damages, because of the constantly fluctuating exchange rates between the United States and Canada.

On July 21, 1993, the Debtors filed their homestead declaration on the Property.[3]

Neither of the Debtors has resided in Arizona for quite some time.[4]

### ISSUES

The issues before this Court are:

. . . . .

I. *WHETHER THE CONTRACT TO SELL REAL PROPERTY, WHICH HAS BEEN REDUCED TO A JUDGMENT, IS AN EXECUTORY CONTRACT WHICH MAY BE ASSUMED BY THE TRUSTEE.*

II. *WHETHER THE CLAIM FOR COMMISSIONS AND MONETARY DAMAGES UNDER THE SUPERIOR COURT JUDGMENT MAY BE SETOFF AGAINST THE SALE PROCEEDS EVEN THOUGH THE DEBTORS HAVE FILED A POST-PETITION HOMESTEAD DECLARATION.*

### LEGAL ANALYSIS

I. *WHETHER THE CONTRACT TO SELL REAL PROPERTY, WHICH HAS BEEN REDUCED TO A JUDGMENT, IS AN EXECUTORY CONTRACT WHICH MAY BE ASSUMED BY THE TRUSTEE.*

■ The Court must first determine the nature of an executory contract and the limits, if any, placed upon parties if the contract is no longer executory. The Ninth Circuit decision of *In re Alexander*, 670 F.2d 885 (9th Cir.1982), notes that the term "executory contract" is not defined in the Bankruptcy Code. *Id.* at 887. However, the Ninth Circuit reviews the Legislative History and states that an executory contract is one in which "performance remains due to a some extent on both sides." *Id.* This definition is not dissimilar from the initial definition proposed by *Countryman* and utilized under the Bankruptcy Act, the predecessor to the Bankruptcy Code. *Id.*

In analyzing the issue of what is an executory contract, this Court should also consider the facts in *Alexander.* In that decision, the debtor had entered into a contract for the sale of her home to the plaintiffs Benevides. The purchase price for the home was the sum of $73,000, with certain conditions to be met in a 60–day period. *Id.* at 886. The plaintiffs deposited certain funds in escrow. On the date of the closing, the plaintiffs deposited the additional funds necessary to close escrow and had received a loan commitment from a financial institution to pay the balance of the purchase price. Therefore, the plaintiffs had tendered full performance. The debtor refused to close. The plaintiffs then commenced an action for specific performance. On the day of the trial, the debtor filed a Chapter 13 bankruptcy petition. *Id.*

The issues presented in *Alexander* were whether the contract was still executory, and if so, whether the debtor could reject the contract as a part of the Chapter 13 plan. Applying the aforesaid definition concerning executory contracts, the Ninth Circuit concluded that although the plaintiffs had *tendered* performance, performance still remained due on both sides. *Id.* at 886–87. Thus, the contract was still executory. *Id.* at 888.

However, this Court must distinguish the facts in *Alexander* from those before this Court. In *Alexander*, no prepetition judgment of specific performance had been entered by the court. This Court's review of the cases on the issue of what constitutes an executory contract reflects that the entry of a judgment is a critical point.

For instance, in *Roxse Homes, Inc. v. Roxse Homes Ltd. Partnership*, 83 B.R. 185 (Bankr.D.Mass.1988), *aff'd* 860 F.2d 1072 (1988), the district court considered the effect of the entry of a judgment of specific performance. Roxse Homes, Inc. owned a subsidized housing complex, for which it had received federal mortgage financing from the Department of Housing and Urban Develop-

---

**3.** The date of the filing of the homestead declaration and the fact that the Debtors no longer reside in Arizona were not in the original Stipulated Statement of Facts in this matter. Howev-

er, the parties agreed to these facts at the hearing before this Court.

**4.** See note 3, *supra.*

ment (hereinafter "HUD"). *Id.* at 186. Roxse Homes, Inc. encountered financial difficulties, and at one point was $3,000,000 in arrears to HUD. A restructuring of the debt was proposed and agreed to between Roxse Homes, Inc. and HUD, but it required that the housing complex be sold to a new entity called Roxse Homes Limited Partnership. Roxse Homes, Inc. and the Limited Partnership entered into a contract for sale, which required Roxse Homes, Inc. to transfer the housing complex and a $1,700,000 escrow fund to the Limited Partnership and the Limited Partnership would pay $13,700,-000 to Roxse Homes, Inc. After HUD approval of the transaction was obtained, Roxse Homes, Inc. refused to close the transaction. *Id.* The Limited Partnership sued Roxse Homes, Inc. and a judgment of specific performance was entered by the court. *Id.* at 186–87. The judgment was appealed by Roxse Homes, Inc., but Roxse Homes, Inc. subsequently filed a bankruptcy petition prior to the decision on appeal having been rendered. The appellate court's affirmance of the lower court's judgment was determined to be null and void because of the imposition of the automatic stay in bankruptcy. *Id.*

In *Roxse,* the bankruptcy court had concluded that the initial sale/purchase contract no longer existed because it had been reduced to a judgment. *Id.* at 187. The district court affirmed this decision, noting that the rights of the parties were "derived from the pre-petition state court judgment, which cannot be 'rejected' under § 365." *Id.* The district court went on to state:

> Once a judgment for specific performance is entered, the parties['] remaining unperformed obligations become non-material, or "ministerial" acts through which the parties merely carry out the court's directive.

Indeed, the State Court's order in *Roxse* was *self-executing.* It provided that a special master would fulfill the parties' obligations if the parties refused to do so. *Id.*

In yet another decision, *Kendall Grove Joint Venture v. Martinez–Esteve,* 59 B.R. 407 (Bankr.S.D.Fla.1986), the debtor refused to close a transaction concerning a buy-sell

agreement. *Id.* at 408. The buyer sued the debtor, obtained a judgment for specific performance, and the final order was entered. The debtor in *Kendall* argued that the contract was executory based upon the following factors:

(1) no title had passed;

(2) the judgment provided for reciprocal obligations to buy and sell in the future;

(3) no part of the purchase price had been paid;

(4) the risk of loss remained with the seller;

(5) the sale was conditioned upon the seller having "good, marketable tile"; and

(6) all encumbrances were to be paid out of the purchase price.

*Id.* at 409. In the bankruptcy proceedings, the debtor wanted to reject the contract pursuant to Section 365 of the Bankruptcy Code. *Id.* at 408. The bankruptcy court ruled that the debtor could not reject the contract, since it was no longer executory. The debtor appealed. *Id.*

On appeal, the district court relied on the analysis in the decision of *In re Jolly,* 574 F.2d 349 (6th Cir.1978), *cert. denied, Still v. Chattanooga Memorial Park,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). The district court agreed with the *Jolly* court, insofar as an executory contract must contain "obligations which continue into the future." *Id.* at 409, quoting *In re Jolly,* 574 F.2d at 351. The district court concluded that the debtor only had a ministerial obligation of delivering title, with no future obligations for the debtor to perform. *Id.*

In the decision of *In re Anderson,* 36 B.R. 120 (Bankr.D.Hawaii 1983), the bankruptcy court came to a different conclusion concerning a sale agreement. The debtor and the bank had entered into an agreement concerning the sale of certain leasehold property. *Id.* at 121. The debtor and the bank entered into the agreement in March of 1978. The purchase price was $825,000, with a down payment of $45,725. The balance of the purchase price bore interest at the rate of 8.75 percent per annum (8.75%). The debtor was to pay off the balance of the purchase price over a period of five years. The debtor

began making installment payments and then ceased making the payments. Subsequently, the bank filed a complaint concerning the debtor's default, the debtor cured the arrearages and the bank dismissed the action. The debtor defaulted a second time, and the bank again filed a new suit to cancel the agreement. Prior to filing bankruptcy, the state court entered an order which did not cancel the agreement, but treated the debtor's default as an acceleration of all remaining amounts due and owing under the agreement. *Id.* at 122. The court further ordered foreclosure of the property, if the debtor did not pay the amount due within 45 days of its order. The debtor failed to make the payment, and a decree of foreclosure was entered. The debtor appealed this determination, but ultimately lost on appeal. Prior to the foreclosure sale of the property, the debtor filed a bankruptcy petition. *Id.* One of the issues presented to the bankruptcy court was whether the debtor could still assume or reject the agreement.

Relying on the Ninth Circuit decision of *Alexander*, the bankruptcy court concluded that the agreement was still executory. *Id.* at 123–24. However, the bankruptcy court also heavily relied on certain policy considerations set forth in Hawaiian law. Apparently, low-income individuals in Hawaii are unable to purchase an interest in real property except through an agreement for sale mechanism, which permits lower down payments, installment payments over a period of time, and a less stringent loan-to-value ratio. *Id.* at 124. Therefore, such underlying policy considerations made the bankruptcy court extremely reluctant to work a forfeiture and deprive the debtor of an opportunity to assume the contract within a specific period of time. *Id.* at 124, 127.

The *Anderson* case is distinguishable from the case before this Court, because of the difference in the policy considerations and the difference in the judgments obtained prepetition. First, there are no statutes or cases in Arizona which would set forth the policy considerations so heavily relied upon by the *Anderson* court. Second, the decree of foreclosure in *Anderson* required certain additional action to be taken that was arguably not ministerial, including the foreclosure sale of the property. The debtor in *Anderson* was able to file the bankruptcy petition prior to any foreclosure sale. In the case before this Court, the parties need only perform certain ministerial actions to convey the Property, and if the actions are not performed, the judgment specifies which individual will so act to effectuate same.

Moreover, both *Roxse*, 83 B.R. 185 (Bankr. D.Mass.1988), and *Kendall*, 59 B.R. 407 (Bankr.S.D.Fla.1986), appear to be more factually similar to the case before this Court. As in those cases, the contract to sell the real property was reduced to a judgment of specific performance. Rule 70 of *Arizona R. Civ. P.*[5] also makes the judgment self-executing and vests title in the Winters. The Debtors only obligation is the ministerial task of conveying title. If the Debtors refuse to comply, the judgment provides a mechanism for the Clerk of the State Court to act. Thus, the Movants and the Trustee have requested that this Court permit assumption of the underlying agreement with the Debtors which is not possible. The contracts which the Trustee wishes to assume are no longer executory.

5. Rule 70 provides:

1. If a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the Court and the act when so done has like effect as if done by the party. On application of the party entitled to performance, the clerk shall issue a writ of attachment or sequestration against the property of the disobedient party to compel obedience to the judgment. The court may also in proper cases adjudge the party in contempt.

2. If real or personal property is within the state, the court in lieu of directing a conveyance thereof may enter a judgment divesting the title of any party and vesting it in others and such judgment has the effect of a conveyance executed in due form of law. When any order or judgment is for the delivery of possession, the party in whose favor it is entered is entitled to a writ of execution or assistance upon application to the clerk.

## II. WHETHER THE CLAIM FOR COMMISSIONS AND MONETARY DAMAGES UNDER THE SUPERIOR COURT JUDGMENT MAY BE SETOFF AGAINST THE SALE PROCEEDS EVEN THOUGH THE DEBTORS HAVE FILED A POST-PETITION HOMESTEAD DECLARATION.

### (a.) The Nature of Setoffs Generally

The Ninth Circuit recently considered the importance of the creditor's right to a setoff in the context of a Chapter 11 proceeding. *Carolco Television, Inc. v. Nat'l Broadcasting Co. (In re De Laurentis Entertainment Group, Inc.)*, 963 F.2d 1269 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 330, 121 L.Ed.2d 249 (1992). De Laurentis Entertainment Group, Inc. emerged from Chapter 11 bankruptcy proceedings as the reorganized debtor, Carolco Television, Inc. (hereinafter "CTI") *Id.* at 1271. During the course of the bankruptcy proceedings, CTI sued the National Broadcasting Co. (hereinafter "NBC") concerning a prepetition debt owed by NBC to CTI's predecessor in interest. NBC asserted a right of setoff as a defense to the proceedings. *Id.* at 1270–71. NBC also filed a motion to vacate the automatic

stay and a proof of claim. *Id.* at 1271. Each pleading asserted the right of setoff. *Id.* NBC did not assert such a right other than before the bankruptcy court. *Id.* at 1277. The debtor/CTI's plan of reorganization was confirmed by the bankruptcy court, and NBC did not file an objection to confirmation. *Id.* at 1274. Even after confirmation, the adversary proceedings between CTI and NBC progressed, with discovery and other proceedings being conducted. *Id.* at 1277.

In *De Laurentis*, the Ninth Circuit had to determine whether the discharge received by a debtor pursuant to Section 1141 [6] somehow precluded the creditor from asserting a right of setoff against CTI. The Ninth Circuit noted that although it was a case of first impression for the Circuit, the issue had been considered by other courts. *Id.* The Ninth Circuit also reviewed the general issue of a discharge and the right of setoff in the context of Chapter 7 and 13 proceedings under the Bankruptcy Code and under the Bankruptcy Act. *Id.* at 1277–78.

Of importance to this Court, in the context of this proceeding, is the discussion of the *De Laurentis* court of the interplay between Section 524(a)(2) [7] and Section 553(a) [8] in a

---

6. The relevant provision is 11 U.S.C. § 1141(d)(1), which states:

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan; and

(B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

(2) The confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under section 523 of this title.

(3) The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

(4) The court may approve a written waiver of discharge executed by the debtor after the order for relief under this chapter.

7. 11 U.S.C. 524(a)(2) provides in pertinent part:

(a) A discharge in a case under this title—

 * * * * * *

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

8. 11 U.S.C. § 553(a) provides:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed other than under section 502(b)(3) of this title;

Chapter 7 proceeding. The Ninth Circuit cited *In re Buckenmaier*, 127 B.R. 233, 236–37 (9th Cir. BAP 1991), in its analysis and concluded:

> The majority view provides strong support for the primacy of section 553, since those courts subordinate section 524(a)(2) to that provision even though section 524 *expressly* applies to setoffs.

*De Laurentis*, 963 F.2d at 1276. Referring to *Buckenmaier*, the Ninth Circuit continued:

> Our reading is also consistent with the history of bankruptcy laws. Setoffs have a long and venerable history, dating back to Roman and English law. Setoffs in bankruptcy are almost as venerable, having been established in England in 1705 and in the United States in 1800. *Buckenmaier*, 127 B.R. at 327. Since that time, setoffs in bankruptcy have been "generally favored," and a presumption in favor of their enforcement exists.

*De Laurentis*, 963 F.2d at 1277. The Ninth Circuit determined that it would be unfair to permit the debtor to sue or assert a claim against the creditor, require the creditor to pay its obligation in full to the debtor, and yet permit the debtor to utilize the discharge as a means to prohibit the creditor from receiving any payment or a *de minimus* payment on the debtor's obligation to the creditor. *Id.*

### (b.) *What Constitutes A Setoff Under Section 553*

█ Section 553(a) states that a creditor may offset a prepetition amount owed to the debtor by the amount of the prepetition debt owed by the debtor to the creditor. Hence, the debts or obligations must be mutual and must arise before the commencement of the bankruptcy case.[9] However, even though setoffs are favored, they are not automatically permitted. *In re Pieri*, 86 B.R. 208, 210 (9th Cir. BAP 1988). Unless there are com-pelling circumstances, setoffs in bankruptcy are generally enforced. *Buckenmaier*, 127 B.R. at 237. In order for a setoff to be considered the elements of timing and mutuality must be established.

█ Here both claims of the Movants arose prepetition. The Movants' prepetition claims may be described as follows. As a result of the judgment of specific performance, the Winters have a claim for damages resulting from the fluctuation of the United States–Canadian exchange rates and for court costs and attorneys' fees. In turn, as a result of the same judgment, Mohave Realty is owed prepetition compensation; that is, a commission for assisting the Debtors in the sale of the Property, and court costs and attorneys' fees. In turn, pursuant to the underlying contract of sale, the Debtors are entitled to the net proceeds from the sale of Property after the payment of closing costs. The claims are mutual, since each side owes the other side something, albeit the claims arise in different contexts and are of a different character. *Buckenmaier*, 127 B.R. at 237 (indicating that the two claims do not need to arise from the same transaction and may be of different character). Thus, the elements for the application of the doctrine of setoff have been met. This Court, however, must decide whether the doctrine of setoff may be applied to the facts of this case, since the Debtors have asserted that the proceeds received from the sale are exempt.

### (c.) *Arizona Law And The Interplay Between A Sale Of Real Property And The Assertion Of The Claim Of Homestead*

█ In determining whether a right of setoff is permitted, the bankruptcy court must also analyze the applicable state law and determine whether a setoff would be permitted. *See In re Buckenmaier*, 127 B.R. at 238. In this case, Arizona law is applicable to the dispute between the parties. A

---

(2) such claim was transferred, by an entity other than the debtor, to such creditor—
(A) after the commencement of the case; or
(B)(i) after 90 days before the date of the filing of the petition; and
(ii) while the debtor was insolvent; or
(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;
(B) while the debtor was insolvent; and
(C) for the purpose of obtaining a right of setoff against the debtor.

**9.** See Footnote 8.

court, in the first step of the setoff analysis under state law, must consider generally a sale of real property and the debtor's assertion of a claim of homestead with respect thereto.

In *Strahan v. Haynes,* 33 Ariz. 128, 262 P. 995 (1928), the plaintiff, Haynes, sued the defendant, Strahon, for specific performance of an alleged agreement concerning the purchase and sale of certain real property. *Id.* 262 P. at 996. The plaintiff, by the payment of consideration, had acquired the interest of a William C. Fields to purchase the defendant's real property. *Id.* at 997. The defendant had continued to rent the real property after the date of the agreement for sale, and did not account to the plaintiff for any rent received. *Id.* The plaintiff alleged that there was a continuous tender of performance by the plaintiff, but that the defendant refused to convey the property. One of the defenses raised by the defendant was that the agreement for sale could not be enforced, because of the defendant's claim of homestead on the real property. *Id.*

The applicable Arizona Statute at the time concerning homesteads required, *inter alia,* that the person declaring the homestead must select certain real property, in one compact body, that did not exceed in value the sum of $4,000.[10] The statute further prohibited the forced sale of real property upon which a person claimed a homestead,[11] and

the claim of homestead continued until the person abandoned or waived same.[12]

In analyzing the dispute, the Arizona Supreme Court first considered the agreement entered into between the parties. The Court concluded that it was a contract that was sufficiently definite in its terms that either side could insist on specific performance. *Id.* at 999.

Next the court considered whether a judgment of specific performance was a "forced sale" of the real property, so that the defendant could utilize her claim of exemption to void the judgment of specific performance. The court determined that upon the execution of the contract of sale, the defendant merely held bare legal title to the real property and the estate or interest in the real property was conveyed to the plaintiff. Therefore, a voluntary "sale" of the real property occurred at the time of the execution of the contract or agreement, and there was no "forced sale" of the real property. The judgment of specific performance merely enforced the contract or agreement, in essence giving notice to third parties. *Id.*

The court next considered when the declaration of homestead was recorded. If the declaration was recorded *after* the execution of the agreement or contract, then the defendant would have already transferred her equitable interest in the real property, retaining only bare legal title, and she would have no ability to assert a claim of homestead,

---

**10.** Civil Code, R.S.A., § 3288 (1913) then provided as follows:

> Every person who is the head of a family, and whose family resides within this state, may hold as a homestead, exempt from attachment, execution and forced sale, real property to be selected by him or her, which homestead shall be in one compact body, not to exceed in value the sum of four thousand dollars, and shall consist of the dwelling house in which the claimant resides and the land on which the same is situated or of land that the claimant shall designate, provided the same is in one compact body.

**11.** Civil Code, R.S.A., § 3292 (1913) then provided:

> The homestead shall, from the date of the recording of the claim of homestead, be exempt from attachment, execution and forced sale, and from sale under any judgment or lien existing prior to the recording of such claim,

except a mortgage executed by the husband and wife, if the homestead claimant be married, or by the claimant if unmarried. No such sale made after the recording of the claim of homestead shall be valid or convey any interest in such homestead, whether made under a judgment existing before or after the recording of such claim.

**12.** Civil Code, R.S.A., § 3293 (1913) provided:

> A homestead can be abandoned only by a declaration of abandonment or waiver, or by a grant thereof, or by permanent removal from the state. Such declaration of abandonment, waiver or grant must be executed:
> First, by the husband and wife, if the claimant be married.
> Second, by the claimant alone, if unmarried.
> A declaration of abandonment shall be effectual only from the time of filing the same for record in the office in which the homestead claim was filed.

since equity would have already considered the property sold. *Id.*

In supporting its decision that the judgment of specific performance should be enforced and the real property conveyed to the vendee in the agreement or contract, the court stated:

> While the hardships of a rule are never an excuse for declaring invalid a statute within the constitutional power of the Legislature to enact, yet, when a certain construction of a statute opens the door to fraud and injustice of every description, while a contrary one will accomplish the apparent purpose of the Legislature, and avoid such a result, the latter should be followed. It is a well-known fact that a large percentage of the transfers of realty in the state of Arizona [are] made as a result of executory contracts of sale similar to the one in question. If we hold that the vendor can defeat such a contract at his [sic] whim by the subsequent declaration of a homestead, no man [sic] would be safe in purchasing property, unless the deed were delivered at the time of purchase. It was urged in the brief of defendant that such danger could be avoided by requiring a waiver of homestead in the contract of sale. It is true that in some cases such a proceeding might be effectual, but not in all. If defendant's contention be true, a single man or woman, who executed a contract of sale at a time when there was no right of homestead, by a subsequent marriage would give to his spouse the right under the statute to declare a homestead, and render the previous valid contract void. Nor would an attempted waiver of homestead in such a contract be of any value as against the subsequently acquired marital partner. On the other hand, the construction we have adopted will protect every reasonable right of homestead. It was never intended by the Legislature, in our opinion, that the homestead law should be a means of defrauding innocent parties, and we think an effort to use a declaration of homestead on a piece of property which the declarant had freely and voluntarily agreed to sell before such declaration, to invalidate such agreement to sell, is on its face an attempted fraud on the purchaser. The true purpose of the homestead law is to protect existing rights against involuntary loss, and not to restore rights already voluntarily parted with.

*Id.* at 1000–01.

■ To be sure, as this Court noted at oral argument, Arizona law has changed since the *Strahan* decision was rendered. Arizona case law has clarified that the right to claim an exemption concerning a homestead focuses on the "nest egg" derived from a voluntary sale of the real property, not the tract of land itself. See *Schreiber v. Hill,* 54 Ariz. 345, 95 P.2d 566 (1939).[13]

■ The Debtors also rely on the post-*Strahan* decision of *In re Charles,* 25 B.R. 331 (9th Cir. BAP 1982). The Debtors argue that *Charles* stands for the proposition that any recorded judgment is rendered void as soon as the homestead declaration is filed. However, as discussed at oral argument, this Court believes that such is an overly broad reading of *Charles.* The decision does not discuss the effect of a judgment for specific performance vis à vis a debtor's right to claim a homestead. Moreover, as this Court noted at oral argument, the Arizona Legislature was concerned with the result as set forth in the *Charles* decision and effectively amended the Arizona statutes. Arizona law now provides that if a debtor has equity in the property in excess of the statutory claim of a homestead exemption, the judgment liens are not automatically rendered void, but rather a procedure is employed to ensure that the debtor receives the then statutory amount entitled to protection as an exemption and the excess equity in the property is distributed to the judgment lien creditors. See *Ariz.Rev.Stat.Ann.* §§ 12–1562, 33–1105.

■ Finally, *Ariz.Rev.Stat.Ann.* § 33–1101(C.) was enacted in 1983 by the Legislature to permit a vendor of real property to claim as exempt from the execution of credi-

---

**13.** Other cases prior to *Strahan* held in a similar manner. *See Security Trust & Sav. Bank v. McClure,* 29 Ariz. 325, 241 P. 515 (1925); *Union* *Oil Co. of Arizona v. Norton Morgan Commercial Co.,* 23 Ariz. 236, 202 P. 1077 (1922).

tors certain proceeds received from the sale of real property.[14] This provision states that the claim of exemption may only be made before the date of the "voluntary or involuntary sale of the property". There are no recent cases in Arizona since the change in the statute which interpret when the date of a voluntary sale occurs. However, the discrete issue before this Court is whether the creditor may asset a right of setoff. Certainly the *Strahan* decision stands for the proposition that equitable considerations should be considered by this Court in determining the vendor's rights to the proceeds of a sale. Where the vendee has obtained a judgment of specific performance against a vendor, the vendor should not be able to claim a homestead to defeat the right of the vendee to collect any damages incurred by the vendee as a result of the prepetition refusal of the vendor to convey certain real property to the vendee.

■ Although the realtor in this case is placed in a somewhat different posture, there is no dispute that Mohave Realty rendered valuable services to the Debtors and obtained a purchaser for the Property. The Debtors only had a change of heart as to whether they should proceed with the sale. Again, for setoff purposes, the Court can conclude that in equity, the Debtors should be precluded from asserting their right to the proceeds from the sale as exempt homestead proceeds without paying the damages which resulted from the specific actions of the Debtors.

Finally, bankruptcy courts, in furtherance of their equitable powers, have permitted a debtor to claim certain real property as exempt, pursuant to the applicable state laws, *after* the bankruptcy petition has been filed. For instance, in *Schultz v. Mastrangelo*, 333 F.2d 278 (9th Cir.1964), the Ninth Circuit interpreted Arizona law and concluded that

an adjudication in bankruptcy under the Bankruptcy Act was equivalent to a levy, not a sale, of real property and that a debtor could file a homestead declaration up to the point of sale. *See also, In re Gitts*, 116 B.R. 174 (9th Cir. BAP 1990) *aff'd*, 927 F.2d 1109 (9th Cir.1991) (the debtors took the necessary steps under Washington law to declare a homestead exemption; thus, the *Gitts* court determined that based upon the debtors' rights as of the petition date, under Washington law, the postpetition declaration of homestead created an exemption which was valid vis à vis the trustee. *Id.* at 179–80); *In re Zohner*, 156 B.R. 288 (Bankr.D.Nev.1993) (the court found the postpetition homestead exemption to be valid, since the Nevada law allowed the declaration to be filed any time prior to the sale). However, in the aforesaid cases, the debtors were residing on the real property, and the real property was not sold prepetition by the debtors.

■ In this case, both of the Debtors sold the Property prepetition to the Winters. A prepetition judgment of specific performance was also entered against the Debtors as to both the Winters and Mohave Realty. Both of the Debtors left Arizona shortly after their respective bankruptcy petitions were filed. Therefore, in balancing the equities, it is difficult to deny the Winters and Mohave Realty the ability to setoff their prepetition claim for damages against any claim of homestead by the Debtors.

(d.) *Cases Which Have Considered The Issue of Setoff Against Exempt Property*

■ No Arizona case law focuses directly on the issue of a setoff against exempt property. The Movants argue that *McLaws v. Kruger*, 130 Ariz. 317, 636 P.2d 95 (1981), supports their position that the proceeds derived from the voluntary sale of the exempt

**14.** *Ariz.Rev.Stat.Ann.* § 33–1101(C.) provides in pertinent part:

If a homestead claimed under subsection A has been duly recorded before the date of a voluntary or involuntary sale of the property, the homestead exemption, not exceeding the value provided for in subsection A, automatically attaches to the claimant's equity interest in identifiable cash proceeds from the sale.

The homestead exemption in identifiable cash proceeds continues for eighteen months after the date of the sale of the property or until the claimant files a new claim of homestead exemption pursuant to subsection A, whichever period is shorter. Only one homestead exemption at a time may be held by a person under the provisions of this section.

homestead property may be utilized to satisfy a judgment. While it is true that the *McLaws* court permitted a creditor with a money judgment to garnish the proceeds being held by a title company after a debtor voluntarily sold certain property upon which a homestead declaration was recorded, Arizona law at that time did not provide a specific exemption concerning the *proceeds* received from such a voluntary sale. Arizona law now protects such proceeds. *Ariz.Rev. Stat.Ann.* § 33–1101(C).

■ The majority of the courts which have considered whether a creditor may setoff against exempt property have declined to permit the setoff.[15] However, such cases do not deal with the facts before this Court. The Debtors in this case refused to convey the Property to the purchasers. Their delay caused the Winters to pay effectively an increased amount for the Property because of the exchange rates between the United States and Canada and caused the Winters and Mohave Realty to incur attorneys' fees and court costs in an action for specific performance. In essence, the Debtors caused certain damages to be incurred and then filed a bankruptcy petition *and* a *postpetition* homestead declaration to insulate them from their own actions. In fairness to the Movants, the Arizona exemption laws should not be used for such purposes.

There are cases within the Ninth Circuit which have permitted a setoff against exempt assets. The cases are *In re Pieri*, 86 B.R. 208 (9th Cir. BAP 1988), and *In re Winnett*, 97 B.R. 7 (Bankr.E.D.Cal.1989).

In *Pieri*, the debtor and his partner filed a suit against a landlord for refusing to permit the debtor and his partner to enter the leased premises. *Pieri*, 86 B.R. at 209. Subsequently, the landlord, unaware that the debtor and his partner had already filed bankruptcy petitions, filed a suit against said parties for the damage done to the premises. The debtor and his partner claimed that any funds received by them in the suit against the landlord were exempt property. *Id.* Thus, the *Pieri* court had to determine if a setoff could be applied against exempt assets.

The *Pieri* court was faced with reconciling 11 U.S.C. § 522(c) with 11 U.S.C. § 553. The *Pieri* court determined that since the language between the two sections appeared to be inconsistent, that the last in order controlled. *Id.* at 213 (citing *United States v. Jackson*, 143 F. 783, 787 (9th Cir.1906)). Thus, the court determined that Section 553 controlled. The *Pieri* court then stated that a setoff could only be applied if it was not in violation of the state's policy regarding exemptions. *Pieri*, 86 B.R. at 213. By allowing the setoff to apply in *Pieri*, the court noted that equitable results were promoted. The debtor and his partner were not allowed to use the discharge as a means of taking advantage of their creditors. Thus, the court allowed the landlord to offset her claim against that of the debtor. *Id.*

The *Pieri* decision may be reconciled with the line of cases which states that exempt funds are not subject to setoff because of equitable considerations and because the *Pieri* assets were not essential to the survival of the debtor. The debtor in *Pieri* attempted to use the discharge and exemption provisions of the Bankruptcy Code as a sword against the creditors.

In *Winnett*, 97 B.R. 7 (Bankr.E.D.Cal. 1989), the law firm was successful in its appeal and was able to have certain foreclosed property returned to the Winnetts. *Id.* at 9. The debtors subsequently sold the property for cash and a note, and a check was made payable to the law firm. The law firm kept a portion of the funds from the check to

---

15. *See In re Davies*, 27 B.R. 898, 901 (Bankr. E.D.N.Y.1983) (creditor which had proceeded with a setoff had to return exempt property); *In re Monteith*, 23 B.R. 601, 604 (Bankr.N.D.Ohio 1982) (the setoff amount against wages was limited to that amount in excess of the exemption claimed by the debtor); *In re Haffner*, 12 B.R. .371, 373 (Bankr.M.D.Tenn.1981) (setoff not permitted); *Kruger v. Wells Fargo Bank*, 11 Cal.3d 352, 371, 521 P.2d 441, 450, 113 Cal.Rptr. 449, 461 (1974) (creditor could not setoff against exempt property, to do so would affect the ability to pay current living expenses); *In re Fin. Acceptance Co. v. Breaux*, 160 Colo. 510, 516–17, 419 P.2d 955, 958 (Colo.1966) (exempt wages are not subject to setoff); *First National Bank of Cushing v. Funnell*, 144 Okla. 188, 290 P. 177 (1930) (setoff against exempt assets would defeat the purpose of the exemption).

offset the fees owed it by the Winnetts; the remaining amount went to a lien creditor. The Winnetts demanded a return of the funds held by the law firm. The Winnetts also subsequently purchased a home utilizing their right to the funds held by the law firm as a down payment for the home. The Winnetts then filed a bankruptcy petition. *Id.* The *Winnett* court determined that the law firm had a beneficial interest in the funds it held; a setoff was permissible. *Id.* at 12. The *Winnett* court also indicated in *dicta* that a setoff under such circumstances would be allowed against the homestead exemption, since equitable considerations were important factors in determining whether a setoff was permissible. *Id.*

 The purpose behind the homestead exemption under Arizona law is to exempt the amount of money necessary to make sure there is a shelter for the family. *See In re Stanger's Estate,* 75 Ariz. 399, 257 P.2d 593 (1953); *McFarland v. Pruitt,* 69 Ariz. 133, 210 P.2d 963 (1949); *Ferguson v. Roberts,* 64 Ariz. 357, 170 P.2d 855 (1946); *Union Oil Co. v. Norton Morgan Commercial Co.,* 23 Ariz. 236, 202 P. 1077 (1922). Thus, it appears that the exemption is designed to protect the family and/or guarantee the family some place to live. However, as discussed in *Pieri* and *Winnett,* the right to claim an exemption is not unlimited and equitable considerations are important. Arizona law does permit this Court to consider the equities of the situation.

This Court notes that the Debtors were reluctant to sell their home even after the State Court ordered that such be done. By filing bankruptcy and then filing a homestead declaration, the Debtors attempted to avoid the costs associated with the sale of the Property, such as the Mohave Realty Commission, and the damages owed to the Winters and Mohave Realty as a result of the Debtors' actions. The Debtors have since left the State of Arizona. There is no indication that the Debtors intend to utilize the net proceeds from the sale of the Property as a shelter for one or both of the Debtors in Arizona. Under the circumstances set forth in this case, this Court shall permit setoff against the homestead proceeds claimed as exempt by the Debtors.

Based upon the foregoing, the Movants shall submit a form of order which is consistent with this Memorandum Decision.