

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00405-CV

_____

LOCKHEART CHAPEL, INC., Appellant

V.

KATIM ENDEAVORS, INC., Appellee

---

On Appeal from County Court at Law No. 3
Tarrant County, Texas
Trial Court No. 2017-007142-3

---

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

Appellant Lockheart Chapel, Inc. appeals the trial court's judgment (1) ordering specific performance of a commercial real estate contract between Lockheart, as seller, and Appellee Katim Endeavors, Inc., as buyer; (2) awarding Katim attorney's fees; and (3) authorizing Katim to offset the purchase price for the real estate against the awarded attorney's fees. We affirm.

## I. BACKGROUND

On February 4, 2016, Lockheart and Katim entered into a commercial real estate contract whereby Lockheart agreed to sell certain real property located at 3005 Merrick Street in Fort Worth for $25,000. The contract did not contain a set closing date but, rather, provided that closing was to occur "[w]hen under a seperate [sic] contract another buyer is found." The contract required Katim to deposit earnest money of one dollar with the title company not more than three days after the "effective date," which the contract defined as "the date the title company receipts this contract after all parties execute the contract." Additionally, the contract contained a "special provision" providing that all closing costs were to be paid by Katim and the new buyer.

By letter dated September 26, 2017, Katim's attorney informed Lockheart that Katim had received the second contract to sell the property, that it had deposited the $25,000 purchase price in the attorney's trust account, and that it expected Lockheart

to close on the property. On November 3, 2017, Lockheart's attorney responded via email that Lockheart did not intend to close on the contract as requested.

On November 14, 2017, Katim filed suit against Lockheart for specific performance. In addition to specific performance, Katim sought to recover attorney's fees and costs.

In response, Lockheart filed an original answer and counterclaim, which it amended twice. In "Defendant's Third Amended Answer and Second Amended Counterclaims," Lockheart set out special exceptions, a general denial, a request for declaratory judgment, and an allegation of breach of contract, which Lockheart stated entitled it to attorney's fees.

On December 12, 2017, Lockheart sent a "notice" to Katim claiming the contract was terminated because Katim "did not make the earnest money deposit with Texas Secure Title Company as required by Paragraph 5.A." Three days later, a copy of the contract and the one-dollar earnest money were delivered to the title company. On the same day, Nancy Gonzalez, a bookkeeping assistant with the title company, acknowledged receipt of the contract and the earnest money by signing the "Escrow Receipt" on page 14 of the contract.

Thereafter, both sides filed competing traditional motions for summary judgment. Based on its conclusion that Katim had breached the contract by filing suit prior to performing its contractual obligations, the trial court granted Lockheart's

motion for partial summary judgment and denied all relief sought by Katim.[1] Katim appealed the trial court's decision. On appeal to this court, we determined that Katim had not breached the contract by filing suit and that there was a fact issue regarding whether Katim was ready, willing, and able to perform the contract.[2] Accordingly, we reversed the summary judgment and remanded the case to the trial court.[3]

Upon remand, the trial court conducted a bench trial and entered a judgment granting Katim's request for specific performance and ordering Lockheart to close the sale of the property within 30 days.[4] The judgment also awarded Katim $70,000 in attorney's fees and authorized Katim to set off the $25,000 purchase price for the property against the attorney's fees.

This appeal followed.

---

[1]Lockheart's motion was a partial motion for summary judgment because it did not address Lockheart's claim for attorney's fees, which was to be addressed in a separate hearing. The parties subsequently stipulated to the amount of Lockheart's reasonable attorney's fees, and the trial court entered a final, appealable judgment disposing of all issues.

[2]*See generally Katim Endeavors, Inc. v. Lockheart Chapel, Inc.*, No. 02-18-00358-CV, 2019 WL 4122607 (Tex. App.—Fort Worth Aug. 29, 2019, no pet.) (mem. op.).

[3]*Id.* at *8.

[4]Pursuant to Lockheart's request, the trial court issued findings of fact and conclusions of law after the entry of the judgment.

4

## II. DISCUSSION

On appeal, Lockheart raises a number of issues,[5] which can be generally grouped into three broad categories. First, Lockheart asserts that the trial court erred in ordering specific performance of the contract because Katim failed to demonstrate that it performed or was "ready, willing, and able to perform" all of its obligations thereunder.[6] Second, Lockheart argues that, because Katim was not entitled to specific performance, the trial court erred in awarding Katim attorney's fees. Third, Lockheart contends that even if the award of attorney's fees were proper, the trial court erred in authorizing Katim to set off the $25,000 purchase price for the property against the attorney-fee award. For the reasons set forth below, we affirm the judgment of the trial court.

### A. STANDARD OF REVIEW

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that

---

[5]Lockheart enumerates twelve separate issues for appeal in its brief.

[6]As will be discussed below, this first category contains a number of objections to the trial court's findings of fact and conclusions of law, most of which pertain to the interpretation of the contract's provisions concerning Katim's second contract with the new buyer and the obligations of the parties in connection with the closing of sale.

5

the finding should be set aside. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Id.*

We review conclusions of law de novo. *Garner v. Long*, 49 S.W.3d 920, 922 (Tex. App.—Fort Worth 2001, pet. denied) (citing *Piazza v. City of Granger*, 909 S.W.2d 529, 532 (Tex. App.—Austin 1995, no writ)). While we are not bound by a trial court's conclusions of law, we will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Wyde v. Francesconi*, 566 S.W.3d 890, 894 (Tex. App.—Dallas 2018, no pet.). Even an incorrect conclusion of law will not require a reversal if the controlling findings of fact support a correct legal theory. *Wyde*, 566 S.W.3d at 894; *Garner*, 49 S.W.3d at 922. A conclusion of law will not be reversed unless it is erroneous as a matter of law. *Garner*, 49 S.W.3d at 922; *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ).

6

## B. SPECIFIC PERFORMANCE

Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 829 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Specific performance is not a separate cause of action but, rather, is an equitable remedy that is used as a substitute for monetary damages when such damages would not be adequate. *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *Stafford v. S. Vanity Mag., Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied)). "A party seeking specific performance must plead and prove (1) compliance with the contract including tender of performance unless excused by the defendant's breach or repudiation and (2) the readiness, willingness, and ability to perform at relevant times.*" Blue Moon Venture, L.L.C. v. Horvitz*, No. 14-09-00459-CV, 2010 WL 4013533, at *1 (Tex. App.—Houston [14th Dist.] Oct. 14, 2010, no pet.) (mem. op.) (citing *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593–94, 601 (Tex. 2008)).

Lockheart argues that Katim was not entitled to specific performance because Katim did not provide sufficient evidence that it performed or was "ready, willing, and able to perform" all of its obligations under the contract. Lockheart's argument is rooted in its interpretation of the contract's provisions concerning Katim's second contract with the new buyer and the obligations of the parties in connection with the closing of sale. We will address each of Lockheart's contentions in turn.

## 1. The Second Contract

The first nine issues Lockheart raises on appeal all relate, directly or indirectly, to the second contract, particularly the nature and extent of the obligations the original contract placed on Katim with respect thereto.[7] Thus, in order to determine whether the trial court erred in granting Katim's request for specific performance of the original contract, we will need to answer the following questions:

(1) Did the contract require that it be closed "in tandem" with the second contract?

(2) Did the contract require the second contract to close at all?

(3) Did the contract require Katim to deliver the second contract to the title company?

(4) Did the contract require Katim to prove that the second contract was "effective" as a condition precedent to the sale?

(5) Did the contract require Katim to prove that the new buyer under the second contract was "ready, willing, and able" to pay its part of the closing costs under the first contract?

In order to address these questions, we must examine the terms of the contract itself.

The interpretation of a contract is a question of law, which we review de novo. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). When asked to interpret a contract, our primary duty is to ascertain the parties' intent as expressed within the

---

[7]We note that issue number seven in Lockheart's brief asks whether the trial court erred in "finding that there is no requirement in the real estate sales contract that Katim close the contract at the title company." As the trial court did not make any such finding with respect to the first contract, we presume that the "contract" to which Lockheart here refers is the second contract.

8

four corners of the document. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991); *see also Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 200 (Tex. 2019) (emphasizing that "the decisive factor in each case is the language chosen by the parties"). "We begin with the most important consideration in interpreting any contract: 'the plain meaning of the [agreement's] operative language.'" *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 149 (Tex. 2020) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015)). "When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI*, 543 S.W.3d at 763. Objective manifestations of intent dictate the contract's meaning, not "'what one side or the other alleges they intended to say but did not.'" *Id.* at 763–64 (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). "Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'" *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (quoting *Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).

An examination of the original contract between Lockheart and Katim reveals only two references to the second contract—one direct and one indirect. The direct reference is found in paragraph 10 concerning the closing of the sale. The relevant language provides that "[t]he date of the closing of the sale . . . will be . . . [w]hen under a seperate [sic] contract another buyer is found." The indirect reference is

9

contained in paragraph 12, entitled "Special Provisions," which states, in pertinent part, that "[a]ll closing costs will be paid by Katim Endeavors, Inc. and the new buyer. The total amount of $25,000 will be paid to Lockheart Chapel, Inc."

These meager references do not support Lockheart's view of the obligations imposed on Katim under the contract. Under the relevant language, all Katim was required to do was find a second buyer, which it did on September 26, 2017, and together with the second buyer, pay the closing costs of the sale. There is nothing within the four corners of the contract that requires it to close in tandem with the second contract.[8] Indeed, there is no reference to the closing of the second contract at all, much less that it be delivered to the title company.

Lockheart asserts that the delivery of the second contract to the title company "is significant" because it is a necessary prerequisite for the second contract to become effective and without it, the title company could not identify the "new buyer" who is jointly responsible with Katim for paying the closing costs. However, the contract contains no requirement that the second contract become effective—this is a

---

[8]Lockheart's contention that the two contracts must be closed in tandem appears to be based upon the testimony of Bill Hays, Katim's representative, that this was his "understanding." However, as the contract is not ambiguous on this point, Hays's testimony is irrelevant under the parol evidence rule. *See, e.g., URI*, 543 S.W.3d at 764–65. Moreover, even if the court could consider Hays's testimony, his lay opinion would not be dispositive regarding Katim's legal obligations under the contract. *Cf. Mirant Peaker, LLC v. S. Md. Elec. Coop. (In re Mirant Corp.)*, Adv. No. 04-4073, 2005 WL 6443618, at *6 (Bankr. N.D. Tex. Nov. 22, 2005) (recognizing that "witnesses who have no legal training cannot be expected to understand what facts support a specific legal position").

requirement Lockheart seeks to invent out of whole cloth. As to the identity of the "new buyer," even assuming that it were necessary for the title company to know the identity of the second buyer, the delivery of the contract to the title company is far from the only means by which such a disclosure could be accomplished.

Relying on the language of paragraph 12, Lockheart argues that in order to be entitled to specific performance, Katim had to prove not only that it was "ready, willing, and able" to perform its obligations under the contract but also that the "new buyer" under the second contract was "ready, willing, and able" to pay its share of the closing costs. However, this argument is not supported by the language of the contract. The most reasonable interpretation of paragraph 12 is that it was included in the contract to ensure that Lockheart would not have to pay any of the closing costs. This construction is supported by the inclusion of the second sentence providing that "[t]he total amount of $25,000 will be paid to Lockheart Chapel, Inc." as this language underscores the parties' intent that no closing costs would be netted out of the sale proceeds going to Lockheart. Significantly, the contract is silent regarding how the closing costs will be divided between Katim and the new buyer, which makes sense because the division of closing costs between Katim and the new buyer is of no moment to Lockheart. It is entirely possible that Katim would pay all of the closing costs by itself;[9] this is a matter to be resolved between Katim and the

---

[9]In fact, Katim's representative testified at trial that Katim had sufficient funds available to pay the necessary closing costs.

11

new buyer. As a result, it would be unreasonable to require Katim to show that the second buyer, who is not a party to this suit and is not in privity with Lockheart, was "ready, willing, and able" to pay its share of the closing costs—which could be zero—for Katim to be entitled to specific performance. Lockheart has cited no authority that would impose such a requirement, nor is this court aware of any such authority.

We agree with the trial court's determination that the only relevance that the second contract has to the contract between Lockheart and Katim is to determine the closing date of the sale. The requirements concerning the second contract that Lockheart seeks to impose—that it close "in tandem" with the first contract (or, indeed, close at all), that it be delivered to the title company, that it become effective, and that the "new buyer" thereunder prove that it was "ready, willing, and able" to pay its share of the closing costs of the first contract—are not supported by the contractual language. As it is Katim, not Lockheart, who is in privity with the second buyer, any concerns about the second buyer's willingness or ability to perform are Katim's alone.

Accordingly, we answer all five of the questions posited above in the negative and, therefore, see no reason to disturb the trial court's finding that "Katim . . . was ready, willing, and able to close at all relevant times." Accordingly, we overrule Lockheart's issues one through nine.

## 2. Was Katim Required to Set a Closing Date?

Lockheart argues that because Katim never scheduled a closing date, it cannot prove that Lockheart refused and continues to refuse to perform and that, as a result, Katim is not entitled to specific performance of the contract. In essence, Lockheart asserts that scheduling a closing date was a condition precedent for Katim to be entitled to specific performance. However, Lockheart's argument is not supported by either the language of the contract or applicable Texas law.

Lockheart's argument finds no support in the contractual language as the contract itself imposes no requirement on Katim to schedule a closing. Rather, it does not address how closing of the sale will be arranged or which party is responsible for scheduling the closing.

Moreover, even if Katim bore responsibility to schedule the closing, Lockheart's prior repudiation of the contract excused Katim from doing so. *See DiGiuseppe*, 269 S.W.3d at 594–95. "[W]hen a defendant refuses to perform or repudiates a contract, the plaintiff may be excused from actually tendering his or her performance to the repudiating party" as a prerequisite to specific performance. *Id.* at 594. Here, Lockheart has clearly expressed its intention not to perform the contract on at least two occasions. Therefore, Katim was not required to perform the "useless act" or "idle ceremony" of scheduling a closing it had no reason to believe Lockheart would attend before seeking specific performance of the contract. *Id.*

13

Because Katim was not required to schedule a closing of the sale before seeking specific performance of the contract, we overrule Lockheart's tenth issue.

## C. ATTORNEY'S FEES

In its eleventh issue, Lockheart asserts that the trial court erred in awarding attorney's fees to Katim. Lockheart's challenge to the award of attorney's fees is premised on its contention that granting Katim's request for specific performance was itself erroneous. However, we have already determined that the trial court did not err in granting Katim's request for specific performance. As the contract clearly states that the prevailing party in any legal proceeding brought thereunder is entitled to costs and attorney's fees,[10] the trial court did not err in awarding attorney's fees to Katim. *See, e.g., Ifiesimama*, 522 S.W.3d at 690 ("When the trial court finds a breach of contract and awards specific performance as the remedy, the trial court may properly award attorney's fees to the prevailing party if the contract so provides."). We therefore overrule Lockheart's eleventh issue.

---

[10]Paragraph 17 of the contract provides as follows:

If Buyer, Seller, any broker, or the title company is a prevailing party in any legal proceeding brought under or with relation to this contract or this transaction, such party is entitled to recover from the non-prevailing parties all costs of such proceeding and reasonable attorney's fees. This Paragraph 17 survives termination of this contract.

14

## D. SETOFF

In its twelfth issue, Lockheart asserts that the trial court erred in authorizing Katim to set off the purchase price of the property against the award of attorney's fees. For the reasons set forth below, we hold that the authorization to set off the mutual debts was proper.

"The doctrine of setoff is ancient, having its roots in early bankruptcy law in England." *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 618 (Tex. 1992). "The right of setoff recognizes that where parties are indebted to each other, the real amount in issue is the difference between the two debts." *Lavizadeh v. Moghadam*, No. 05-18-00955-CV, 2019 WL 6799756, at *6 (Tex. App.—Dallas Dec. 13, 2019, no pet.) (mem. op.) (citing *Bandy*, 835 S.W.2d at 618). Setoff is a doctrine rooted in the principles of fairness and equity and allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Studley v. Boyston Nat'l Bank*, 229 U.S. 523, 528 (1913).

Contrary to Lockheart's assertions, an award of attorney's fees is not unique and may be subject to setoff just like any other debt. *See Murrco Agency, Inc. v. Ryan*, 800 S.W.2d 600, 603 (Tex. App.—Dallas 1990, no writ); *cf. Streeter v. Thompson*, 751 S.W.2d 329, 331–32 (Tex. App.—Fort Worth 1988, no writ) (offsetting damages and attorney's fees awarded to defendant on counterclaim from plaintiff's award of damages and attorney's fees). For example, in *Murrco* the plaintiff obtained judgments against two defendants and was awarded both damages and attorney's fees.

15

800 S.W.2d at 602. One of the defendants prevailed on a counterclaim against plaintiff and was also awarded damages and attorney's fees, though in a lesser amount. *Id.* In the judgment, the trial court added all damages and interest awarded to the plaintiff and subtracted therefrom the lesser damages awarded to the defendant; however, the trial court did not offset the awards of attorney's fees. *Id.* The court of appeals held that the trial court's failure to offset the attorney's fees was error and reformed the judgment to provide that all awards—including attorney's fees—were offset. *Id.* at 603. Indeed, in the bankruptcy context, creditors have been authorized to do exactly what the trial court authorized Katim to do in this case, namely, to offset a claim for attorney's fees awarded in a cause of action for specific performance of a real estate contract against the purchase price of the real property. *See In re Glaze*, 169 B.R. 956, 964–67 (Bankr. D. Ariz. 1994) (allowing the setoff of purchasers' claim for damages and attorney's fees from the purchase price of debtors' real property when the property was sold under a specific performance order).

Accordingly, we conclude that the trial court did not err in authorizing Katim to set off the $25,000 purchase price for the property against its award of attorney's fees and overrule Lockheart's twelfth issue.

### III. CONCLUSION

Having overruled all of Lockheart's issues, we affirm the judgment of the trial court.

16

/s/ Brian Walker

Brian Walker
Justice

Delivered:  August 18, 2022